**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**GINA CRIBB,**

       **Plaintiff,**

                                   **Case No. 2:12-cv-90**
                                   **JUDGE SMITH**
    **v.**                                 **Magistrate Judge Kemp**

**ALCON LABORATORIES, INC.,**

       **Defendant.**

**ORDER**

This matter is before the Court on Defendant, Alcon's, motions for summary judgment and to file excess pages. (Docs. 31, 34). For the reasons that follow, Defendant's motion to file excess pages (Doc. 31) is **DENIED** and its motion for summary judgment (Doc. 34) is **GRANTED**.

    **I.**    **MOTION FOR LEAVE TO FILE IN EXCESS OF PAGE LIMITS**

As a preliminary matter, the Court deals with Defendant's motion for leave to file excess pages. The Southern District of Ohio Local Rule 7.2(a)(3) limits the length of memoranda to 20 pages unless counsel includes certain front-matter to aid the reader in digesting the longer material. As such, on the face of the rule, no request for leave is required prior to filing. Thus, this Court does not strike or refuse to consider the filings of either party in this case, notwithstanding the fact that they exceed the 20-page limit set by Rule 7.2. However, the Court will not grant the motion for leave to file in excess of page limits because that might imply approval of the lengthy memoranda the parties have filed in this case.

There are two parties in this case.  There is one claim (albeit duplicated under the laws of two separate sovereigns).  The law governing that claim is, and has been for many years, well established.  The motion for summary judgment seeks just one form of relief.  These are simple circumstances.  Yet, Defendant's reply memorandum, for instance, <u>excluding</u> front matter, tables, and certificate of service, runs 42 pages – more than double the page limit for a primary memorandum of law. (Doc. 55, Reply in Supp. of SMJ).  Including front matter and other materials, it swells to 54 pages. *Id.*  There is no justification in this case for such unchecked verbosity.

## II.    INTRODUCTION AND BACKGROUND

Plaintiff, Gina Cribb, brings an action under Ohio Revised Code, section 4112.99 and Title VII, against her former employer, Defendant, Alcon Laboratories, Inc. (Doc. 8, Amend. Compl. *in passim*).  Alcon employed her as a drug representative (in the record sometimes called a GSR) – a person who calls upon doctors in order to convince them to prescribe more of Alcon's drugs as compared to competitors' products. (Doc. 11, Answer at ¶¶ 8-9).  Although Cribb did not sell drugs but rather attempted to convince doctors to prescribe Alcon's drugs more frequently, her job was in the character of a traveling salesperson.  She had samples, a territory in which she roamed, and a set of physicians with whom she kept in regular contact.  Cribb alleges that Alcon fired her from this position in 2011 because she became pregnant. (Doc. 8, Amend. Compl. at ¶ 44).  She seeks damages and reinstatement. *Id.* at Prayer for Relief.

Alcon hired Cribb by letter dated September 11, 2006, as an "at will" employee. (Doc. 34-1, Cribb Depo. Ex. 5, Emp. Ltr.; Doc. 46-2, Cribb Depo Ex. 2, Standards of Conduct).  While at Alcon, employees are frequently reviewed and graded by their managers.  During the relevant time period, 2009-2011 Alcon had four grades "Clearly Exceeds Expectations" (CEE), "Fully Meets Expectations" (FME), "Partially Meets Expectations" (PME), and "Below Expectations"

(BE). (*See, e.g.*, Doc. 46-2, Cribb Depo. Ex. 11, FVR 6/2010).  During two years preceding her termination,  Cribb had two managers – first, Ed Sauer, and then, Kevin Patterson.

In her performance review for the year 2009 (measured from December 1, 2008-November 30, 2009), Cribb's first manager, Ed Sauer, ranked her PME overall. (Doc. 34-1, Cribb Depo. Ex. 9, 2008-2009 Annual Perf. Rev.).  Because of this, on December 1, 2009, Sauer issued her a written warning letter. (Doc. 34-1, Cribb Depo. Ex. 10, Warning Ltr.).  This letter warned that Cribb had not appropriately submitted her Prescription Drug Marketing Act (PDMA) forms on time, had not timely reconciled her inventory, and was not entering her physician calls in a timely fashion. *Id.*  It warned that failure to meet these requirements could result in discipline, including termination. *Id.*  In 2010, Sauer again conducted an annual review – this time for the period of December 1, 2009-November 30, 2010. (Doc. 46-2, Cribb Depo. Ex. 15, 2009-2010 Annual Perf. Rev.).  He ranked her BE overall. *Id.*  As a result of that ranking, Sauer placed Cribb on a 90-day Performance Improvement Plan (PIP) to start in January 2011. (Doc. 46-2, Cribb Depo. Ex. L, PIP Doc.).  At the end of 2010, the manager to whom she reported changed from Ed Sauer to Kevin Patterson.  In the first and final review under her new manager, Patterson also ranked her BE overall.[1] (Doc. 46-2, Cribb Depo. Ex. 22, 2010-2011 Annual Perf. Rev.).  Handwritten on the top of this review, appears a notation by human resources director, Susan Rendon, "Recommend Term." *Id.*  Rendon testified that this was a notation she made when she, Patterson, and Patterson's superior, Alfred Hanson, made the decision to terminate Cribb. (Doc. 51-1, Rendon Depo. at 20:13-21:7).

---

[1] Because Cribb was terminated mid-year in 2011, this review does not include the entire year but rather sums up her performance year to date.

In addition to annual reviews, Alcon managers conducted (usually monthly) field visits. These visits resulted in "Field Visitation Reports" (sometimes called FVR in the documents). Cribb's overall ratings in her field visitation reports were as follows:

| Reviewing Manager | Dates of Visits | Overall Rating | Docket Citation |
|---|---|---|---|
| Sauer | June 3 & 17, 2010 | PME | (Doc. 46-2, Cribb Depo. Ex. 11, FVR 6/2010) |
| Sauer | Aug. 16 & 17, 2010 | BE | (Doc. 46-2, Cribb Depo. Ex. 13, FVR 8/2010) |
| Sauer | Sept. 20, Oct. 25 & 26, 2010 | BE | (Doc. 46-2, Cribb Depo. Ex. 14, FVR 9-10/2010) |
| Patterson | Jan. 12 & 13, 2011 | BE | (Doc. 46-2, Cribb Depo. Ex. 17, FVR 1/2011) |
| Patterson | Feb. 28 & March 1, 2011 | PME | (Doc. 46-2, Cribb Depo. Ex. 18, FVR 2-3/2011) |
| Patterson | April 13 & 14, 2011 | BE | (Doc. 34-1, Cribb Depo. Ex. 19, FVR 4/2011) |
| Patterson | May 9 & 10, 2011 | BE | (Doc. 46-2, Cribb Depo. Ex. 20, FVR 5/2011) |

These FVRs and the annual reviews encompassed both subjective and objective data. Objectively, for example, sales figures, call statistics (frequency of contact with target doctors), and timely submission of required paperwork, were a part of the rating. (*See, e.g.*, Doc. 46-2, Cribb Depo. Ex. 11, FVR 6/2010). Subjectively, field visits allowed managers to observe the salesperson at work and grade his or her presentation method based on compliance with the standard sales approach that Alcon required its representatives to use. (Doc. 50-1, Patterson Depo. at 113:14-118:23, 123:22-131:17, 146:15-151:23, 158:12-159:3, 163:3-163:17, 165:1-168:1 (Describing Alcon sales strategies/employee evaluation areas such as PLAN IT, LASR, Commitment (3 Ss), Use of Visuals, Brand Story Communication, Three Product Interactions, DISC, Planning and Executing, Communicate Effectively, Commit to Excellence, Lead Change, Build Relationships, Know the Business, Focus on the Customer, Think and Act Strategically, and Exercise Good Judgment); *see also id*. at 151:21-154:1 (explaining that the overall ranking is

not an average of the graded categories, but rather that categories have different weights)). Without going into exhaustive detail, as one might expect from the overall rankings received by Cribb, the supervisor comments in her evaluations were largely critical.

Both Patterson and a coworker, Lori Blumer, testified in deposition that Cribb was perceived has having a negative attitude. (Doc. 47-1, Blumer Depo. at 59:23-61:19; Doc. 50-1, Patterson Depo. at 148:18-149:14). Patterson, in particular, testified that Cribb was defensive, difficult to coach, and on one occasion reacted to his attempts to provide constructive feedback by yelling (which included mild profanity). (Doc. 50-1, Patterson Depo. at 72:7-73:17, 142:19-144:23). Patterson also testified that, in his opinion, Cribb was generally a good person but lacked work ethic and was not a good sales person. *Id.* at 235:14-237:8.

During Patterson's visit on May 9, 2011, Cribb and Patterson had lunch together at a sit-down restaurant. (Doc. 46-1, Cribb Depo. at 98:9-98:13). Cribb testified during deposition that, as they talked over the meal, Cribb revealed that she was pregnant. She then testified as follows:

> Q:      [D]id you simply inform [Patterson] that you were pregnant?
>
> Cribb: Yes.
>
> Q:      Did you say anything else?
>
> Cribb: No. I just said, I have news. I'm having another baby.
>
> Q:      And what did he say?
>
> Cribb: He kind of sat back in his chair and said, oh, were you trying to get pregnant?
>
> Q:      And did he say anything else?
>
> Cribb: Well, I responded with, yes, you know, we want to have a bigger family. And he then said, so that will be two. Are you done then?
>
> Q:      And what was your response?
>
> Cribb: I believe I told him that I wasn't sure what my family plans were beyond that.

(Doc. 46-1, Cribb Depo. at 98:14-99:5). Cribb testified that she felt Patterson's reaction was inappropriate but that she never told him so. *Id.* at 99:19-102:1. Cribb also testified that during a

number of occasions prior to this lunch, Patterson made comments about how his team was mostly women, that women were so dramatic, and that he needed to get some men on his team. *Id.* at 116:20-117:1. She also related that on one other occasion he made what she perceived to be insensitive remarks. Specifically, they were discussing results of a survey that had shown women in the sales force at Alcon were unhappier than their counterparts at other drug companies. *Id.* at 120:10-122:7. Cribb suggested this might be because Alcon required women to use paid time off (PTO) during their maternity leave so that they have none left when they come back and because Alcon does not offer a job share plan to women returning from maternity leave. *Id.* Cribb testified that Patterson responded by suggesting that women returning from lengthy maternity leave should be glad to have a job and that women seeking "job share" options are essentially admitting that they cannot handle their jobs by themselves. *Id.*

Though Cribb does not allege that Sauer had any role in terminating her (other than putting her on a PIP in the first place), she thinks he made discriminatory remarks in regard to her first pregnancy. (Doc. 46-1, Cribb Depo. at 29:6-30:18; *see also id.* at 287:13-287:17 (Cribb was on maternity leave for her first pregnancy from April 16, 2009 to August 4, 2009)). This judgment, she testified, is based on the fact that Sauer said he was upset that she had extended her maternity leave without giving him notice and that he failed to ask after her child when she returned. *Id.* at 40:18-41:19.

Three people, Kevin Patterson, Patterson's manager, Alfred Hanson, and an HR director, Susan Rendon, made the decision to fire Cribb. (*See, e.g.*, Doc. 50-1, Patterson Depo. at 177:7-177:15). In deposition, none of them was able to pin-down exact dates when they discussed firing Cribb. (Doc. 49-1, Hanson Depo. at 6:19-6:23, 55:4-56:14; Doc. 51-1, Rendon Depo. at 47:3-48:12; Doc. 50-1, Patterson Depo. at 36:17-37:3). However, they discussed it more than

once and it is undisputed that the final termination letter was ultimately dated August 5, 2011. (Doc. 46-2, Cribb Depo. Ex. 23, Term. Ltr.).  Rendon, Hanson, and Patterson all knew Cribb was pregnant when she was terminated but all testified that it played no role in their decision to terminate her. (Doc. 49-1, Hanson Depo. at 49:6-49:18; Doc. 51-1, Rendon Depo. at 91:8-91:15; Doc. 50-1, Patterson Depo. at 177:7-177:15, 206:16-206:25).

Both Patterson and Rendon had young children at the time they participated in the decision to fire Cribb.[2] (Doc. 46-1, Cribb Depo. at 102:9-104:17; Doc. 51-1, Rendon Depo. at 84:19-85:20).  In fact, Rendon was hired at Alcon in 2005 when she was far along in a pregnancy, took maternity leave shortly after being hired, and then took maternity leave again for a second pregnancy in 2012. (Doc. 51-1, Rendon Depo. at 84:19-85:20).  Both times she returned to work without incident and was not mistreated in any way. *Id.*  In addition, Patterson, at the time of Cribb's separation from Alcon, supervised a team comprised of one man (Ben Snyder) and five women (Gina Cribb, Jessica Leland, Amber Scarborough, Lorie Blumer, and Pamela Vaughn). (Doc. 50-1, Patterson Depo. at 9:13-10:1).  The Parties deposed all four of Cribb's female coworkers.

While working for Patterson in 2010, Leland became pregnant; she told Patterson about it in March or April of 2010, and went on maternity leave in September 2010. (Doc. 44-1, Leland Depo. at 11:2-12:4).  Leland was, in fact, pregnant again (and still under Patterson's management) in 2013 when her deposition was taken. *Id.* at 11:11-11:12.  During her first pregnancy, Patterson told her to take all the time she needed and even bought her a car seat carrier as a gift. *Id.* at 18:8-18:22.  She has never heard him make any derogatory comments about women or working mothers and was not overly critical of her while she was pregnant or

---

[2] Sauer, who placed Cribb on the PIP, also had young children when he began work at Alcon in 1998. (Doc. 43-1, Sauer Depo. at 6:17-6:19, 55:3-55:7).

when she returned from leave. *Id.* at 18:23-19:6. With respect to her most recent pregnancy, Patterson again acted appropriately towards her. *Id.* at 19:11-19:22. The lowest performance rating Leland has ever received was a PME. *Id.* at 9:21-10:2. Leland is still employed at Alcon. *Id.* at 5:14-5:15.

Scarborough became pregnant and went on and returned from maternity leave without incident while working for Alcon (but before Patterson became her manager). (Doc. 34-8, Scarborough Depo. at 9:3-9:13). Patterson has never made comments to her about working mothers or women who are pregnant nor has she ever felt that he was unfair in analyzing her performance. *Id.* at 11:17-11:25. Scarborough is still employed at Alcon. *Id.* at 5:10-5:11.

Blumer was never pregnant while working at Alcon. (Doc. 47-1, Blumer Depo. at 63:12-63:23). But, at the time of her deposition in 2013, she had two children, ages 12 and 14. *Id.* Thus, when she began work at Alcon in 2002, she had young children. *Id.* at 18:10-18:11. She felt her boss, Sauer, was occasionally condescending toward women because he believed it was his wife's duty to care for their children. *Id.* at 24:6-26:17. However, his comments, she testified, were not gender-related but rather based on his inability to understand how family duties and job duties can be compatible. *Id.* at 28:14-30:17. Indeed, everyone in Sauer's district, male and female, had concerns about Sauer's inability to respect work/life balance. *Id.* at 38:8-38:23. In addition, Blumer felt that it was difficult for a parent who wanted to be involved in the lives of their children to advance at Alcon due to the fact that Alcon management jobs required being on the road 4-5 days per week. *Id.* at 41:6-45:15. She felt this had a disproportionate impact on women who, perhaps more so than their male counterparts, wished to be home with their children. *Id.* Patterson, she said, agreed with her observation but would have encouraged her to apply to management if she had been willing to travel as needed. *Id.* at 44:11-44:23.

8

Patterson never made any comments about women that she felt were negative. *Id.* at 41:6-41:10. Blumer was let go during a reorganization in February 2013 when Novartis acquired Alcon. *Id.* at 49:16-51:7.

Pamela Vaughn became pregnant for the first time while working under Patterson in 2011. (Doc. 34-7, Vaughn Depo. at 11:24-12:12).  She told people at work, including Patterson, about it in September 2011, and went on maternity leave in February 2012. *Id.* 11:24-12:12, 21:3-21:9.  Vaughn still works at Alcon. *Id.* at 8:12-8:16.

### III.  SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any reasonable inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *See, e.g.*, *Crawford v. Metro. Gov't*, 555 U.S. 271, 274 n.1 (2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195, n.2 (2004)); *Muncie Power Prods., Inc.*, 328 F.3d at 873 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The Court

will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## IV.    DISCUSSION

Plaintiff alleges pregnancy discrimination under both federal and state law — specifically, Title VII, as amended by the Pregnancy Discrimination Act, and Ohio Rev. Code, chapter 4112.[3] (Doc. 8, Amend. Compl. at §§ 41-44).[4] Federal law provides, "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." 42 U.S.C. § 2000e(k) (2012); *see also* 42 U.S.C. 2000e-2(a) (2012). Similarly, Ohio Revised Code, section 4112.02(A) prohibits employers from discriminating against (or discharging) any employee because of the employee's sex and the term "because of sex" is also read to mean "because of or on the basis of pregnancy, any illness arising out of or occurring during the course of pregnancy, childbirth, or related medical conditions." Ohio Rev. Code § 4112.01(B). Though the language differs, the substantive standards by which federal and state claims for pregnancy discrimination are evaluated are generally the same. *Tysinger v.*

---

[3] Plaintiff also parrots the words "retaliation" and "hostile work environment" in her amended complaint. (Doc. 8, Amend. Compl at ¶ 44). However, nowhere does Plaintiff allege or argue any facts that would support such claims. *See, e.g.*, *id. in passim*. Moreover, Defendant pointed out Plaintiff's apparent abandonment and failure to adequately assert these putative claims in its motion for summary judgment and Plaintiff did not dispute the abandonment in its response. (*Compare* Doc. 34, Mot. for SMJ at 29-30 *with* Doc. 41, Re. in Opp. to SMJ *in passim*).

[4] There are two paragraph 41s in the first amended complaint. This refers to the second.

*Police Dep't*, 463 F.3d 569, 572 (6th Cir. 2006); *cf. Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 784-88 (Ohio 1999) (noting certain definitions differ substantively between Ohio and federal law).

A plaintiff can fend off a motion for summary judgment on a Title VII claim using either direct or circumstantial evidence of discrimination. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001). In this case, Cribb does not argue that she presents direct evidence of discrimination. (*See* Doc. 41, Re. in Opp. to SMJ *in passim*). Therefore, she must show discrimination by circumstantial evidence. Under the *McDonnell Douglas* framework, Cribb must prove a *prima facie* case of discrimination; then the burden shifts to Alcon to offer a nondiscriminatory reason for Cribb's termination; then the onus is once again on Cribb to show that the reason offered by Alcon is a pretext for discrimination. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007)).

## A. *Prima Facie* Case

> In order to show a *prima facie* case of pregnancy discrimination under Title VII, a plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision."

*Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006) (quoting *Cline v. Catholic Diocese*, 206 F.3d 651, 658 (6th Cir. 1999)).[5]

In this case, as to elements 1 and 3, no meaningful discussion is needed. Cribb was pregnant and she was terminated. 2 and 4, however, require more scrutiny.

---

[5] It is worth noting that the element a plaintiff must meet to show a *prima facie* discrimination case vary somewhat based on the circumstances. For example, in some cases, the Sixth Circuit has said that a plaintiff makes a *prima facie* case by showing, "1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009)). But the spirit of each of the four elements remains intact whatever the formulation

11

### 1. Element 2 – Qualified for the Job

"In a termination case such as this one, a plaintiff meets the second prong by showing that she was performing 'at a level which met [her] employer's legitimate expectations.'" *Cline*, 206 F.3d at 658 (quoting *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990)). In this case, it is relatively clear that Cribb was not. In three annual reviews and over half a dozen field visit reports authored by two different managers, Cribb failed to achieve even a single "fully meets expectations" overall ranking (to say nothing of a "clearly exceeds expectations" ranking). *See supra* pp. 2-4. Every one of her reviews rated her in partial compliance with expectations or below expectations and the majority of the reviews rated her overall performance below expectations. *Id.* The manager, Patterson, who ultimately played a role in her firing, testified that Cribb was defensive and difficult to coach and even Cribb's coworkers noted that her blunt rejection of management ideas in meetings was perceived as negative. *See supra* p. 4.

The undisputed record shows that Cribb was not performing at a level that met Alcon's legitimate expectations. Accordingly, Cribb cannot make a *prima facie* case. However, as this case is in a summary judgment posture, and, as this stage of the analysis concerns Cribb's ability merely to make a *prima facie* case, the Court shall proceed to consider the other questions in this case and assume, *arguendo*, that Cribb could satisfy this element.

### 2. Element 4 – Nexus Between Firing and Pregnancy

A plaintiff can prove the fourth element of the *prima facie* case through comparison to "another employee who is similarly situated in her or his ability or inability to work [and] received more favorable [treatment]." *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996). In this case, Cribb posits three comparators – her replacement, Jay Reichart, and two

coworkers, Lori Blumer and Stephen Gifford.  Temporal proximity between the firing and the pregnancy announcement is also evidence of a nexus. *Asmo*, 471 F.3d at 593.

In this case, there was some sequential temporal proximity between Cribb's announcement of her pregnancy on May 9, 2011, and her firing on August 5, 2011. (Doc. 46-1, Cribb Depo. at 98:9-98:13; Doc. 50-1, Patterson Depo. at 213:4-213:9; Doc. 46-2, Cribb Depo. Ex. 23, Term. Ltr.).  However, the bite of this evidence is blunted by the undisputed fact that Cribb's performance reviews were terrible both before and after her pregnancy announcement. *See supra* pp. 2-4.  Indeed, she was both warned of the possibility of termination and placed on a PIP prior to her pregnancy announcement by a manger who, ultimately, had nothing to do with firing her. (Doc. 34-1, Cribb Depo. Ex. 10, Warning Ltr.; Doc. 46-2, Cribb Depo. Ex. L, PIP Doc. (Sauer is the author of both documents)).  Thus, temporal proximity is evidence, but, on the undisputed facts in this case, does not prove a nexus.  Thus, the Court considers Cribb's comparators.

Gifford is male[6] and is therefore a helpful comparator if he is otherwise similarly situated but was treated better.  However, the record shows that he was not similarly situated.  He had a great deal more seniority at Alcon (having worked there since 1990). (Doc. 48-1, Gifford Depo. at 6:23-7:2).  He, like Cribb, was put on a PIP following a BE (below expectations) performance review. (Doc. 48-2, Gifford Depo. Ex. UU, 2008-2009 Perf. Rev.; Doc. 48-2, Gifford Depo. Ex. YY, PIP Doc.).  However, unlike Cribb, his next performance review was FME (fully meets expectations). (Doc. 48-2, Gifford Depo. Ex. VV, 2009-2010 Perf. Rev.).  Also, unlike Cribb, he was not managed by Patterson. (Doc. 48-1, Gifford Depo. at 59:20-60:1).

---

[6] Cribb does not bring claims based on pure gender discrimination.  Thus, the importance of Gifford's status as a male is not in his status as a man versus Cribb's status as a woman; rather the important fact is that Gifford, being a man, could not become pregnant.

Blumer, though she has children, was never pregnant during her time at Alcon and is, therefore, also a potentially useful comparator. (Doc. 47-1, Blumer Depo. at 63:12-63:23). Although Blumer is a much closer case than other possible comparators because, for instance, she was on a PIP when Patterson took over as her manager, she too was not similarly situated. (Doc. 50-1, Patterson Depo. at 68:19-69:1).   Blumer is not similarly situated because, like Gifford, she had several years more seniority than Cribb. (Doc. 47-1, Blumer Depo. at 18:9-18:11).   More importantly, however, Blumer had a better attitude than Cribb, was taking direction from management, and was improving her sales approach under the PIP rather than reacting defensively to coaching attempts from her manager. (*See, e.g.*, Doc. 49-1, Hanson Depo. at 17:23-18:21; Doc. 51-1, Rendon Depo. at 37:21-39:5; Doc. 50-1, Patterson Depo. at 72:7-73:17, 142:19-144:23).   When both she and Cribb were on PIPs (and before anyone at Alcon knew Cribb was pregnant) their respective field visit report grades were as follows:

|  | **Cribb** |  |  | **Blumer** |  |
|---|---|---|---|---|---|
| **Visit Date** | **Overall Rating** | | **Visit Date** | **Overall Rating** |
| Jan. 12 & 13, 2011 | BE | | Jan. 6 & 7, 2011 | BE |
| Feb. 28 & March 1, 2011 | PME | | March 2 & 3, 2011 | PME |
| April 13 & 14, 2011 | BE | | April 11 & 12, 2011 | PME |

(*Compare* Doc. 46-2, Cribb Depo. Ex. 17, FVR 1/2011; Doc. 46-2, Cribb Depo. Ex. 18, FVR 2-3/2011; Doc. 34-1, Cribb Depo. Ex. 19, FVR 4/2011; *with* Doc. 50-2, Patterson Depo. Ex. AA, FVR 1/2011; Doc. 50-2, Patterson Depo. Ex. CC, FVR 3/2011; Doc. 50-2, Patterson Depo. Ex. DD, FVR 4/2011).   True, Blumer's performance was not greatly superior to Cribb's.  But two PMEs and a BE is better than two BEs and a PME.  Moreover, a BE followed by two successive PMEs is an improvement trend while a BE followed by a PME followed by another BE is a flash of improvement followed by a relapse.

14

Jay Reichart, Cribb's male replacement, had relatively poor sales. (Doc. 42, Reichart Emp. Docs. *in passim*).  That Cribb was replaced by a male with poor sales may be considered suggestive of a nexus between Cribb's termination and her pregnancy.  However, Patterson's uncontroverted testimony is that Reichart was doing well and that low sales numbers can happen when a new sales person takes over a territory. (Doc. 50-1, Patterson Depo. at 78:5-79:15).

It is a close call whether there is more than a scintilla of evidence from which a reasonable jury could conclude that Cribb's termination had a nexus with her pregnancy. However, as this case is in a summary judgment posture, and as this stage of the analysis concerns Cribb's ability to make merely a *prima facie* case, the Court shall give Cribb the benefit of a doubt and hold that she could meet this requirement.

## B.  Non-Discriminatory Motivation for Cribb's Termination

Having decided that Cribb can show a nexus between her termination and her pregnancy, and having assumed, *arguendo*, that Cribb could satisfy the other disputed element necessary to prove a *prima facie* case, the burden is upon Alcon to proffer a non-discriminatory reason for the termination. *See e.g.*, *Chen*, 580 F.3d at 400.

Alcon's non-discriminatory motivation for firing Cribb is her poor performance.  In every annual performance review, from December 1, 2008, to the time of her termination in 2011, Cribb received a low ranking and, in two out of three, she received the lowest possible overall ranking. (Doc. 34-1, Cribb Depo. Ex. 9, 2008-2009 Annual Perf. Rev.; Doc. 46-2, Cribb Depo. Ex. 15, 2009-2010 Annual Perf. Rev.; Doc. 46-2, Cribb Depo. Ex. 22, 2010-2011 Annual Perf. Rev.).  During this time, Alcon issued her a formal warning letter, put her on a PIP, and only after both of those measures failed to improve her performance, fired her. (Doc. 34-1, Cribb Depo. Ex. 10, Warning Ltr.; Doc. 46-2, Cribb Depo. Ex. 16, PIP Doc.; Doc. 46-2, Cribb Depo. Ex. 23, Term. Ltr.).

In addition to these broad-strokes evaluations, in the last year that Cribb was at Alcon, Cribb's performance was evaluated regularly by two different managers – first, Ed Sauer, then, Kevin Patterson. Not until May 9, 2011, did Cribb notify anyone at Alcon that she was pregnant. (Doc. 46-1, Cribb Depo. at 98:9-98:13; Doc. 50-1, Patterson Depo. at 213:4-213:9). Thus, before anyone at Alcon knew of Cribb's pregnancy (and before any discriminatory motive to falsify negative reports could logically have developed) Cribb's managers scored her as follows:

| Reviewing Manager | Dates of Visit | Overall Rating | Docket Citation |
|---|---|---|---|
| Sauer | June 3 & 17, 2010 | PME | (Doc. 46-2, Cribb Depo. Ex. 11, FVR 6/2010) |
| Sauer | Aug. 16 & 17, 2010 | BE | (Doc. 46-2, Cribb Depo. Ex. 13, FVR 8/2010) |
| Sauer | Sept. 20, Oct. 25 & 26, 2010 | BE | (Doc. 46-2, Cribb Depo. Ex. 14, FVR 9-10/2010) |
| Patterson | Jan. 12 & 13, 2011 | BE | (Doc. 46-2, Cribb Depo. Ex. 17, FVR 1/2011) |
| Patterson | Feb. 28 & March 1, 2011 | PME | (Doc. 46-2, Cribb Depo. Ex. 18, FVR 2-3/2011) |
| Patterson | April 13 & 14, 2011 | BE | (Doc. 34-1, Cribb Depo. Ex. 19, FVR 4/2011) |

Alcon has not only asserted a legitimate non-discriminatory motive for firing Cribb, Alcon has presented considerable evidence that Cribb's performance was poor.

## C. Pretext

In order to overcome Alcon's non-discriminatory reason for firing Cribb, Cribb must show that Alcon's purported basis for the termination (1) has no basis in fact, (2) did not actually motivate the action, or (3) was insufficient to motivate the action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Cribb first argues that her sales figures for Travatan Z, an important product at Alcon, were exceptional in May of 2011 and thus she could not truly have been fired for performance reasons. However, Cribb's supposedly good sales figures for May are evidenced by a chart

Cribb created, allegedly from "Alcon business records." (Doc. 45, Cribb Aff. at ¶ 5 & Ex. LL). The Alcon "business records" from May, upon which Cribb swears she relied, are not attached to Cribb's homemade chart, or her affidavit, or, as far as the Court can ascertain, included anywhere in the summary judgment record. *See* Fed. R. Civ. P. 56(c)(2) (the Court need not consider evidence that cannot be presented in a form that would be admissible); *see also* Fed. R. Evid. 1002, 1006 (original records are required to prove content and summaries are allowed only where the summarized material is so voluminous that it cannot be conveniently examined in court).

Notwithstanding the lack of May sales data, Cribb did meet (and even slightly exceeded) her Travatan Z sales goal in April, 2011. (Doc. 46-2, Cribb Depo. Ex. 21, Cribb PIP Summary). Thus, it is not unreasonable to assume, *arguendo*, that Cribb also may have had good sales of Travatan Z in May.  However, the undisputed testimony by the three persons involved in firing Cribb is that only data through April was considered in firing Cribb because the decision to terminate was made by focusing on Cribb's performance during her 90-day PIP period.[7] (Doc. 49-1, Hanson Depo. at 15:1-17:15; Doc. 50-1, Patterson Depo. at 173:6-174:12; Doc. 51-1, Rendon Depo. at 78:8-80:24).

Finally, Cribb's performance was graded on more than just sales of Travatan Z; sales of several other drugs as well as other subjective and objective metrics also factored in. (*See, e.g.*, Doc. 34-1, Cribb Depo. Ex. 19, FVR 4/2011 (showing all the categories on which Cribb was judged and containing negative comments about most)).  That is, a drug representative at Alcon was supposed to present Alcon's products the way Alcon wanted them presented.  Results mattered, but so did how those results were obtained. (Doc. 50-1, Patterson Depo. at 113:14-

---

[7] Although 90 days means the PIP period only extended through March, April sales data would presumably reflect the efforts undertaken by Cribb in March to encourage prescription of Alcon products.

118:23, 123:22-131:17, 146:15-151:23, 158:12-159:3, 163:3-163:17, 165:1-168:1 (Describing Alcon sales strategies/employee evaluation areas); *see also id*. at 151:21-154:1 (explaining that the overall ranking is a weighted consideration of all areas, performance and subjective categories)).  For instance, Patterson, in the April 2011 review (before he found out Cribb was pregnant) made the following comments about Cribb's sales technique:

> You are not utilizing the LASR process consistently or asking for specific commitments regularly.  Your performance with LASR and commitments is currently BE.  During this field ride you did not consistently ask appropriate probing questions, uncover the physician's needs, overcome barriers, or ask for specific commitments.  Many of your calls included features dumps with no benefits to the patients or the physician.  Two examples of calls where LASR was not used appropriately are below.

> Dr. Caudell – This was a two product lunch meeting that included both Travatan Z and Azopt.  During this call you did not utilize LASR effectively to uncover his barriers or overcome them with your resources.  You also did not gain a specific commitment.  You asked first level probes but when the physician presented you with his opinion or barrier you did not size it up or ask second level questions to understand him better.  You [sic] openings with both products were also not specific and slowed down the sales process.  This call included features without benefits.

> Dr. Goeshen – This was a three product call that included Travatan Z, Azopt and Tobradex ST.  Similar to the previous call you did not utilize LASR effective to uncover barriers or overcome them with you [sic] resources.  During this call your probing question with Travatan Z was very leading.  He is a competitive target and you asked him if Travatan Z is what he is using for MC switches.  You did not uncover his barriers with Travatan Z and with Azopt you did not probe to uncover what he uses as an adjunct and why he uses it.  With Tobradex ST you sold solely on managed care coverage and did not discuss the science of the product.  This call also included features without benefits.

(Doc. 34-1, Cribb Depo. Ex. 19, FVR 4/2011).  These sorts of comments are paradigmatic of the reviews Cribb received while working for Alcon both before and after her pregnancy announcement. (*See, e.g.*, Doc. 34-1, Cribb Depo. Exs. 11, 13-14, 17-20 (FVRs 6/2010-5/2011); Doc. 34-1, Cribb Depo. Exs. 9, 15, 22 (Annual Perf. Revs. 2008-2011)).  Moreover, Cribb received negative reviews regardless of who reviewed her.  For instance, in addition to negative reviews by Patterson and Sauer, there are two reviews in the record by regional managers.  One

18

regional manager, R. Bowen, commented that Cribb simply read the slides during a presentation, "lack[ed] passion" and left "potential business on the table" as a result. (Doc. 46-2, Cribb Depo Ex. 8, Bowen FVR).  The other, D. Jurenka, said Cribb, "did not consistently demonstrate the capability to close . . . ." (Doc. 46-2, Cribb Depo Ex. 12, Jurenka FVR).  Even assuming that Cribb had good sales numbers on one drug, Travatan Z, every manager who reviewed her in the time preceding her pregnancy still thought she was not doing a good job marketing the drugs in the way Alcon wanted their products marketed. (*See supra* pp. 17-18; *see also, e.g.*, Doc. 50-1, Patterson Depo. at 235:14-237:8 (Cribb was a good person, just not a good sales person)).

In addition to arguing that her Travatan Z sales were so good that her performance could not have been considered poor, Cribb also argues that her managers' comments showed their bias against pregnant women.  Her managers' bias against pregnant women, she argues, not her poor performance, is the reason she received negative performance reviews.  Or, put simply, poor performance is but a poor pretext.

Cribb argues that bias is evident in Patterson's reaction to her pregnancy announcement and in his other expressions related to women.  Specifically, Cribb testified:

Q:      [D]id you simply inform [Patterson] that you were pregnant?

Cribb:  Yes.

Q:      Did you say anything else?

Cribb:  No. I just said, I have news.  I'm having another baby.

Q:      And what did he say?

Cribb:  He kind of sat back in his chair and said, oh, were you trying to get pregnant?

Q:      And did he say anything else?

Cribb:  Well, I responded with, yes, you know, we want to have a bigger family. And he then said, so that will be two.  Are you done then?

Q:      And what was your response?

Cribb:  I believe I told him that I wasn't sure what my family plans were beyond that.

19

(Doc. 46-1, Cribb Depo. at 98:14-99:5). Cribb also alleged that Patterson made comments about how his team was mostly women, that women were so dramatic, and that he needed to get some men on his team. *Id.* at 116:20-117:1.  Cribb also explained that on one occasion she and Patterson were discussing the results of a survey that had shown women in the sales force at Alcon were unhappier than their counterparts elsewhere. *Id.* at 120:10-122:7.  Cribb had posited that this might be caused by Alcon's policy requiring women to use paid time off (PTO) during their maternity with the result that they had none left when they come back to work and because Alcon does not offer a job-share plan to women returning from maternity leave. *Id.*  Cribb testified that Patterson responded by suggesting that women returning from lengthy maternity leave should be glad to have a job and that women seeking "job share" options are essentially admitting that they cannot handle their jobs by themselves. *Id.*  Cribb also alleged that her former manager, Sauer, held negative attitudes about pregnant women.  Specifically, he was upset when Cribb extended her first maternity leave without giving him notice and then he failed to inquire after her new baby when she returned from leave. *Id.* at 40:18-41:19.

The first, and biggest problem with Cribb's bias argument (and indeed this entire case) is timing.  Cribb first revealed her pregnancy to Patterson and Alcon on May 9, 2011, and she received negative performance reviews after that date. (Doc. 46-1, Cribb Depo. at 98:9-98:13; Doc. 50-1, Patterson Depo. at 213:4-213:9; Doc. 46-2, Cribb Depo. Ex. 20, FVR 5/2011; Doc. 46-2, Cribb Depo. Ex. 22, 2010-2011 Annual Perf. Rev.).  Yet, Cribb had consistently terrible performance reviews for 9 months preceding her pregnancy announcement too. (Doc. 46-2, Cribb Depo. Exs. 11, 13-15, 17-18; Doc. 34-1, Cribb Depo. Ex. 19 (Cribb's pre-pregnancy performance reviews, six FVRs and one annual)).  In fact, in the nine months leading up to her May pregnancy announcement, she was reviewed seven times. *Id.*  Of those seven, five were the

lowest possible overall rating (below expectations or BE) and two were the second-to-lowest possible rating (partially meets expectations or PME). *Id.* In not a single one was Cribb graded as having met (to say nothing of "clearly exceeded") expectations. *Id.* In short, even assuming that Patterson and Sauer had held secret biases toward pregnant women, those biases cannot explain the uniformly negative performance reviews received by Cribb prior to her pregnancy announcement and hence, bias is also not a reasonable explanation for the fact that the negative performance reviews continued after her pregnancy announcement.

The next problem with Cribb's allegations is the undisputed truth about the family circumstances of her coworkers and managers. Both Patterson and Rendon had young children at the time they participated in the decision to fire Cribb.[8] (Doc. 46-1, Cribb Depo. at 102:9-104:17; Doc. 51-1, Rendon Depo. at 84:19-85:20). In fact, Rendon was hired at Alcon while pregnant, took maternity leave shortly after being hired, then took maternity leave again for a second pregnancy shortly after firing Cribb. (Doc. 51-1, Rendon Depo. at 84:19-85:20). Moreover, Patterson supervised a team comprised of one man (Ben Snyder) and five women (Gina Cribb, Jessica Leland, Amber Scarborough, Lorie Blumer, and Pamela Vaughn). (Doc. 50-1, Patterson Depo. at 9:13-10:1). Leland, Scarborough, and Vaughn all became pregnant while working for Alcon; none of them were fired or treated badly. (Doc. 44-1, Leland Depo. at 5:14-5:15, 9:21-10:2, 11:2-12:4; Doc. 34-8, Scarborough Depo. at 5:10-5:11, 11:17-11:25, 9:3-9:13; Doc. 34-7, Vaughn Depo. at 8:12-8:16, 11:24-12:12, 21:3-21:9). Leland testified, in fact, that during the first of two pregnancies she experienced while managed by Patterson, Patterson told her to take all the time she needed and even bought her a car seat carrier as a gift. (Doc. 44-1, Leland Depo. at 18:8-18:22).

---

[8] Sauer, who placed Cribb on the PIP, also had young children when he began work at Alcon in 1998. (Doc. 43-1, Sauer Depo. at 6:17-6:19, 55:3-55:7).

The final problem with Cribb's argument is the nature of the remarks made by Sauer and Patterson.  While Cribb clearly infers bias from the remarks, the Court is not convinced, under the circumstances of this case as revealed by the undisputed record, that this is a "reasonable inference" of the type the Court is compelled to draw when deciding summary judgment. *See, e.g.*, *Crawford*, 555 U.S. at 274 n.1.  Cribb's inference, rather than being based on the actual content of the statements, seems to be founded on the belief that Alcon, Sauer, and Patterson had an obligation to be happy about her pregnancy and that their failure to express such joy and support is proof of discriminatory animus.  This notion is mistaken.[9]

Our society, through the legislative expressions of Congress and the Ohio General Assembly, has decided that a woman should not be forced to choose between the reasonable pursuit of her career and having a baby. *See, e.g.*, 42 U.S.C. §§ 2000e(k), 2000e-2(a); Ohio Rev. Code §§ 4112.01(B), 4112.02(A).  Accordingly, we require employers to treat pregnant employees the same as their other employees and we punish those who act upon discriminatory assumptions about how their employees will perform given their sex and parental status.  It is both just and proper that we do this.

However, equal treatment is what Title VII requires – not preferential treatment. 42 U.S.C. § 2000e(k) ("women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . .").  Accordingly, an employer need not pretend that pregnancies have no costs or that an employee's decision to reproduce is somehow a boon for the business.  After all,

---

[9] The Court acknowledges that a divided panel of the Sixth Circuit (although, technically, one judge of the 2-judge majority was a senior status Seventh Circuit judge sitting by designation) held that a supervisor's failure to congratulate an employee who was having twins was "evidence showing pretext . . . ." *Asmo*, 471 F.3d at 594. However, the supervisor in *Asmo* failed to congratulate in a setting where a chorus of other coworkers were engaged in congratulating Asmo. *Id.*  That is, even *Asmo* does not hold that the supervisors have a duty to congratulate and that failure to do so is evidence of bias; rather it holds that the supervisor's behavior, failing to congratulate while all the other people in the room were congratulating, was aberrant and one reasonable inference (though by no means the only inference) was bias. *Id.*

in the case of a sales job, absence of the salesperson causes sales to slip and the temporarily abandoned sales territory to stagnate.  In fact, apparently not spotting the irony, Cribb, during deposition, blamed her poor performance in 2009-2010 on the lengthy maternity leave she took for her first pregnancy. (Doc. 46-1, Cribb Depo. at 232:16-235:9).  Moreover, taking a several-month paid maternity leave is expensive – the employer pays the employee but receives nothing in return.  Indeed, the Seventh Circuit recognized that an employer does not violate Title VII's requirement of evenhanded treatment when it terminates an employee whose maternity leave is too costly under the rationale that it would also terminate any other employee who sought to take several months off work for non-pregnancy related reasons. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994).[10]

Title VII and Ohio Revised Code, chapter 4112, are important laws.  Society's recognition that child-rearing responsibilities are entitled to respect and that employers should not discriminate based on an employee's choice to have children, is laudable.  Moreover, this Country's formal rejection of the barbarisms of sexism and racism surely stands as one of modern America's greatest achievements.  But not every firing of a minority or protected class is sexist or racist and membership in a minority group or protected class is not a license to sue whenever an adverse employment decision is rendered.

## V.  CONCLUSION

Defendant, Alcon's, motion to file excess pages (Doc. 31) is **DENIED** and its motion for summary judgment (Doc. 34) is **GRANTED**.

---

[10] This decision only speaks to what does and does not offend Title VII.  The decision does not endorse failure to provide leave that may be authorized by the Family and Medical Leave Act.  However, even the FMLA does not require an employer to give preferential treatment to a pregnant employee.  The FMLA, for example, accords unpaid leave to eligible employees of both sexes upon a number of family events – not just birth. *See, e.g.*, 29 U.S.C. §§ 2601, 2611, 2612 (2012).

The Clerk is directed to **REMOVE** documents 31 and 34 from the Court's pending motions list.

The Clerk is directed to **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**


                          */s/ George C. Smith*
                        **GEORGE C. SMITH, JUDGE**
                        **UNITED STATES DISTRICT COURT**